ALDEN F. ABBOTT
General Counsel
MATTHEW H. WERNZ
mwernz@ftc.gov
JOANNIE T. WEI
jwei@ftc.gov
Federal Trade Commission
230 South Dearborn, Suite 3030
Chicago, Illinois 60604
312.960.5596 (Wernz)
312.960.5607 (Wei)
ATTORNEYS FOR PLAINTIFF

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>         Plaintiff,<br><br>     v.<br><br>AGE OF LEARNING, INC., a corporation, also d/b/a ABCmouse and ABCmouse.com,<br><br>         Defendant. | **Case No. 2:20-cv-7996**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief

COMPLAINT

for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of Section 4 of ROSCA, 15 U.S.C. § 8403.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405. ROSCA prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements for disclosure, consent, and cancellation to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence—i.e., their failure to reject an offer or cancel an agreement—as consent to be charged for good and services.  16 C.F.R. § 310.2(w).

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and ROSCA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, 8404.

## DEFENDANT

6.      Defendant Age of Learning, Inc. ("Age of Learning"), also doing business as ABCmouse and ABCmouse.com, is a Delaware corporation with its principal place of business at 101 North Brand Boulevard, 8th Floor, Glendale, California 91203.  Age of Learning transacts or has transacted business in this

COMPLAINT

District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Age of Learning has advertised, marketed, distributed, or sold online educational programs to consumers throughout the United States.

## COMMERCE

7.     At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS PRACTICES

8.     From 2015 until at least 2018, Defendant failed to adequately disclose key terms of memberships to access online educational content for children. Touting twelve-month memberships for $59.95, Defendant enrolled consumers in yearly plans that renewed indefinitely at the same price after the twelve months expired.  Defendant failed to disclose material information about these and other term memberships, including that they automatically renew, that Defendant would charge members each year unless they cancel, and what consumers must do to cancel.  Even though consumers who signed up were prominently promised "Easy Cancellation," Defendant for years made cancellation difficult.  Many consumers tried without success to cancel by calling, emailing, or contacting Defendant through a customer support form.  Rather than accepting these cancellation methods, Defendant instead required consumers to find and navigate a lengthy and confusing cancellation path that repeatedly discouraged consumers from canceling and, in many instances, resulted in consumers being billed again without their consent. Over the course of at least three years, hundreds of thousands of consumers visited Defendant's cancellation path but remain enrolled.  Even consumers who completed Defendant's cancellation path later discovered ongoing charges for additional content they believed they had canceled along with their

COMPLAINT

- 3 -

base memberships.  Defendant has received at least tens of thousands of consumer complaints about these practices.

### Defendant's Misleading Enrollment Practices

9.     Defendant operates a membership-based online learning tool called ABCmouse Early Learning Academy for children ages 2 to 8 years old. ABCmouse includes digital content on reading, language arts, math, and other subjects.  Consumers can access ABCmouse at Defendant's website, abcmouse.com, and through Defendant's mobile application ("app").  Defendant provides consumers access to ABCmouse through memberships, which typically cost from $9.95 for monthly memberships to $59.95 for twelve-month memberships.

10.    On ABCmouse.com and in its app, Defendant has advertised membership to ABCmouse Early Learning Academy.  Above an animated image of a teacher gesturing to her classroom, Defendant displayed a bright green gift tag with a prominent link offering consumers a "Special Offer 38% OFF Annual Membership! Learn More!"  The following is a representative image of such an offer from Defendant's website:

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19      11.      Consumers who clicked on the "Special Offer" link were directed to

20   an enrollment page with the same green gift tag.  There, next to a prechecked box,

21   in large blue and red bold font, Defendant offered consumers a membership

22   costing either "**$59.95 for 12 Months**" or "4 equal monthly installments of

23   $19.75."  Defendant promised "**Easy Cancellation**" in bold, red text, stating: "If

24   your family does not absolutely love ABCmouse, you can cancel at any time!"

25   Defendant promised the same "Easy Cancellation" to consumers who enroll in

26   monthly memberships.  To enroll, consumers were required to submit their email

27   address, password, and payment information, and they also were required to check

28
                                                        COMPLAINT

a box agreeing to Defendant's terms and conditions.  A representative image of the
enrollment page is below:



12.     Consumers who used this page to sign up for a twelve-month
ABCmouse membership were instead enrolled in a negative option plan under
which Defendant charged them $59.95 immediately and each year thereafter until
they affirmatively have canceled.  For at least three years, Defendant did not
disclose these facts anywhere on the enrollment page.  Nor did Defendant disclose
how consumers were to accomplish the advertised "easy cancellation."

COMPLAINT

13.     Similarly, when consumers enrolled in a 30-day free trial of an ABCmouse monthly membership, Defendant often offered them alternative payment options following their free month, including twelve months for $39.95 or six months for $29.95.  Defendant also often offered all consumers who signed up for twelve-month memberships access for twelve months at the cost of $39.95 to Defendant's "Assessment Center," a separate service that includes quizzes and lessons to measure children's skills.  Defendant did not disclose that after charging consumers who selected these options immediately for the stated membership term, Defendant would charge consumers again at the end of that period for the full six or twelve months, and on a recurring basis thereafter until they canceled.

14.     Rather, during these three years, Defendant described the ongoing nature of these term memberships only in separately hyperlinked terms and conditions.  Even if consumers were to click on the hyperlinked terms and conditions, however, they would be unlikely to see that Defendant's term memberships automatically renew each year.  Defendant buried this information in dense text, in small font and in single-spaced type.

15.     Not until in or around early 2018, after receiving a Civil Investigative Demand from the Federal Trade Commission, did Defendant modify its term membership enrollment pages to include information about the membership's automatic renewal.  Even then, for its twelve-month membership, Defendant buried that information in the smallest font on the page under a bright red heading labeled "Easy Cancellation."  This disclosure was not close to or in similar size, brightness, or prominence to Defendant's representation that consumers were paying "**$59.95 for 12 Months**" of membership.  Thus, despite this modification, consumers were unlikely to see any disclosure of the automatic renewal of their twelve-month memberships.

COMPLAINT

- 7 -

16.     Tens of thousands of consumers have complained to Defendant that they did not know that ABCmouse memberships would automatically renew. These complaints have continued after the 2018 change discussed in paragraph 13 above.  Many of these consumers also complained that they had not authorized Defendant to charge their accounts on an ongoing basis.  For example, one consumer who was surprised to be charged automatically for a second twelve-month period complained, "No one asked me if I wanted to subscribe again.  My personal account was just accessed without my permission."

17.     Defendant was well aware of these types of consumer complaints. Indeed, in January 2015, after completing an internal review, Defendant concluded that common customer support issues include that the "Subscription page is misleading," and "Customers are confused about their billing plan on registration, customers do not like that they [are] not notified of their auto-renewal."

18.     Despite that conclusion, no changes were made, and consumers continued to complain.  More than a year later, a customer service representative described a consumer complaint as "the standard 'I only subscribed for 1 year and now I'm being billed again' complaint."  By 2018, three years after the internal review, Defendant's Vice President of Customer Support described the same problem, that consumers were complaining that automatic renewals of twelve-month memberships were:

> catching them off guard as they did not recognize it was an auto-renewal . . . . [W]e encounter many customers that are confused as to what it is that they are signing up for in terms of length of subscription and even more so how much and when they will be charged.

19.     Despite more than three years of similar complaints, Defendant continued to enroll consumers in term memberships without clearly and

COMPLAINT

- 8 -

conspicuously disclosing to them the ongoing charges associated with those memberships or how to cancel them.

### Defendant Made It Difficult for Consumers to Cancel

20.     ABCmouse memberships—including monthly and term memberships—automatically renew until consumers cancel.  For years, Defendant restricted the ways consumers could cancel their memberships, permitting cancellation only through an online mechanism within Defendant's website and app that was difficult for consumers to find and complete.  Consumers who requested cancellation via this mechanism often have believed they canceled, but Defendant continued to charge them anyway.  Defendant routinely refused to honor consumers' cancellation requests that were not made through the online mechanism.  As a result, Defendant continued to charge tens of thousands of consumers who requested cancellation or believed that their accounts had already been canceled.

*Defendant Refused to Accept Cancellation Requests*
*by Telephone, Email or Web Form*

21.     On its website and in its app, Defendant did not post a customer service telephone number or email address that consumers could use to contact Defendant to cancel their memberships.

22.     Some consumers were able to find a telephone number for Defendant by searching online, however.  Consumers who called this number often were unable to reach a customer service representative because of long wait times that resulted in many consumers simply hanging up.  For example, in each month from October 2016 through April 2018, consumers who called the customer service line had to wait an average of at least 10 minutes to talk with a customer service representative.  In December 2017, according to Defendant's internal data, the average wait time exceeded 30 minutes.  By June 2017, the call-abandonment rate

COMPLAINT

resulting from these wait times had risen to more than 30 percent, which Defendant acknowledged was "out of control." By the end of 2017, 60 percent of all calls to Defendant were abandoned without consumers reaching an ABCmouse representative. In many instances, consumers who reached a customer service representative were told that they could not cancel their memberships by phone, and were instead directed to Defendant's website or app to cancel.

23. Some consumers also were able to find an email address for Defendant by searching online. Consumers who emailed Defendant to request cancellation often were told that they could not cancel their memberships by email, and were instead directed to Defendant's website or app to cancel.

24. Numerous consumers submitted requests to cancel their memberships through a web form found on Defendant's website in the "Parent Home" page, by clicking on "Customer Support" and then on a link labeled "Contact Us." The "Contact Us" form included a box in which consumers could type a message, and many consumers used this box to notify Defendant they wanted to cancel their memberships. However, instead of honoring these cancellation requests, Defendant typically responded that, "A member's account can only be cancelled by that member on the site itself, not via email or any other means." Defendant claimed that requiring consumers to cancel through the site's cancellation mechanism "helps us to ensure that accounts are not cancelled unintentionally or maliciously." Defendant refused cancellation requests from more than 100,000 consumers in this way, instead redirecting them to Defendant's website to cancel.

*Defendant Used a Hard-to-Find, Poorly Labeled*
*Online Cancellation Mechanism*

25. Consumers often had difficulty locating Defendant's online cancellation mechanism. To do so, consumers first had to go to the "My Account" section of Defendant's website, where there were three boxes labeled "Account

COMPLAINT

- 10 -

Information," "Membership," and "Billing."  Consumers were required to click on the "Membership" box, which took them to a summary of their membership terms and included a link to "Customer Support" at the bottom of the page.  Clicking on "Customer Support" would not take consumers to Defendant's online cancellation mechanism, but would send them to a series of frequently asked questions and the "Contact Us" link described above.  In the lower left corner of the Membership screen, Defendant included a link in small, light colored font, to its "Cancellation Policy."  Instead of the cancellation policy, however, this link took consumers to Defendant's online cancellation mechanism.

26.    For years, consumers who wanted to cancel their memberships often were unable to find this cancellation mechanism on Defendant's site.  Defendant received complaints that consumers were unable to locate this online cancellation mechanism, but Defendant did not take any steps to make this mechanism more prominent or easier to locate.  In September 2016, one of Defendant's customer support representatives noted that when Defendant directed consumers to its site to cancel, the membership "never gets canceled by the customer and then we get several more emails back or angry calls."

*Defendant's Online Cancellation Mechanism Confused, Misdirected, and Frustrated Consumers Requesting Cancellation*

27.    Even those consumers who were able to locate the cancellation path through the "Cancellation Policy" on Defendant's website still had difficulty canceling because the path did not clearly inform consumers how to cancel and instead required consumers to navigate several pages of promotions and links that, when clicked, directed consumers away from the cancellation path without warning.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28.     The first screen in the path often appeared as depicted below.



29.     Although this was the first screen of Defendant's online cancellation path, it did not tell consumers that they had arrived at the correct place to cancel their memberships.  Indeed, nowhere on this screen did the word cancellation, or any variation of it, appear.  Instead, this screen promoted ABCmouse's availability across several devices.  The only way for consumers to continue along Defendant's cancellation path was by clicking the button labeled "No Thanks, Continue" in the lower right-hand corner of the screen.  Clicking this button would lead consumers to a series of other screens promoting additional ABCmouse features.

30.     Defendant often labeled buttons on these screens with vague and inconsistent descriptions, leaving many consumers confused about how to successfully complete Defendant's cancellation path.  For example, on one screen, depicted below, Defendant asked consumers to provide a reason for canceling, invited consumers to "contact our Customer Support team" through a link, and displayed buttons labeled "Back Home, "No Thanks, I'll Wait," and "Continue."

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13    31.    Consumers who clicked the "Customer Support" link or the "Back
14  Home" or "No Thanks, I'll Wait" buttons would be removed from the cancellation
15  path and would remain enrolled, often without their knowledge or consent.

16    32.    The only way to continue along the cancellation path was to provide a
17  reason for canceling and then click "Continue."  But doing that took consumers to
18  another screen, where Defendant attempted to persuade consumers not to cancel.
19  For example, as shown below, a consumer who indicated "My Child Is Not
20  Interested" as a reason for cancellation would be presented with a screen, labeled
21  "Before You Go…," and relaying a message that "many children love visiting the
22  Aquarium, Hamster, Zoo, Farm, and the Shopping areas of our site," along with
23  links to those areas:

24
25
26
27
28

COMPLAINT

- 13 -

1
2
3
4
5
6
7
8
9
10
11
12
13



14      33.     On this "Before You Go…" screen, consumers who clicked any of the
15  five links to other areas of Defendant's site or on the "Back Home" or "No Thanks,
16  I'll Wait" links would be removed from the cancellation path and would remain
17  enrolled, often without their knowledge or consent.
18      34.     Consumers who pressed "Continue" on this screen were not canceled
19  but were taken to still another screen, as shown below, prompting consumers to
20  "Learn More" about an opportunity to "Upgrade" their memberships.
21
22
23
24
25
26
27
28

COMPLAINT



35.     Consumers who clicked on the "Learn More" link would again be removed from the cancellation path.  Defendant prompted these consumers to enter their passwords and click "Submit" on a popup that, in small print, stated that consumers would be billed.  Defendant charged consumers who entered their passwords immediately for an additional twelve-month ABCmouse membership. Many consumers reported that they remained enrolled in this way without their knowledge or consent.

36.     Consumers who clicked on the "Back Home" or "No Thanks, I'll Wait" link on this screen would again be removed from the cancellation path and would remain enrolled in their existing membership at the existing price, often without their knowledge or consent.

37.     In total, Defendant displayed along the cancellation path between six and nine screens that consumers were required to navigate to cancel their memberships.  None of these screens informed consumers of the total number of screens along the cancellation path or how many screens remained before their

COMPLAINT

memberships would be canceled. Consumers could not skip ahead or cancel without visiting each screen. Each screen included multiple links and buttons that, if pressed, would take consumers out of the cancellation path and maintain their memberships.

38.    Defendant failed to provide a simple cancellation mechanism by which consumers could stop recurring charges. Defendant's cancellation mechanism was not disclosed on its product order or confirmation pages, nor in the confirmation emails consumers receive for their online transactions. Additionally, it was much more difficult to cancel a membership and Defendant's recurring charges than it is to sign up for the membership and to initiate the recurring charges.

39.    Moreover, unbeknownst to many consumers, canceling their memberships did not cancel all charges associated with their accounts. Many consumers who enrolled in Defendant's "Assessment Center" found that they continued to be charged for the Assessment Center even after canceling their ABCmouse memberships. Many of these consumers found that, even once they realized they needed to separately cancel their Assessment Center membership, they could not do so because Defendant had deactivated their login credentials when they canceled their ABCmouse memberships. Thus, for at least seven months, consumers complained to Defendant that they did not understand that canceling their ABCmouse memberships would not also cancel the Assessment Center membership.

*Defendant's Restrictive Cancellation Practices*

*Resulted in Unauthorized Charges*

40.    From 2015 to at least 2018, tens of thousands of consumers complained to Defendant that they were unable to cancel their ABCmouse memberships or that they did cancel their memberships but nevertheless were

COMPLAINT

charged after cancellation.  For example, one consumer complained that "Your website will not allow me to cancel my subscription. … I have gone through all the ridiculous questions about a dozen times, and the site does not allow me to finish the cancellation."  Another consumer, who had attempted to cancel an ABCmouse membership multiple times, complained, "I cancelled this account 3 times . . . . I had to request 2 ACH returns to get my money back after twice correctly cancelling my account including multiple emails and phone calls to abcmouse.com."  In November 2017, Defendant's Vice President of Customer Support wrote to Defendant's COO, two Vice Presidents of Marketing, President of Production, and Senior Director of Operations, noting a "dramatic increase in the amount of [customer support] tickets as well as the amount of phone calls" received by Defendant, and identifying consumer "confusion and/or inability to find and complete the cancellation on-line" as a "constant that has generated the large majority of all tickets since my arrival."

41.    At least thousands of consumers complained about incurring unauthorized charges related to the Assessment Center even after canceling their base membership.  Defendant tracked customer complaints related to this subject under the heading, "Customer Suggestion: Assessment Subscription should not require separate cancellation."  Instead of fixing the issue, however, Defendant developed and used a template customer support response stating, "We investigated this matter and discovered that although your ABCmouse subscription was cancelled, your subscription to the Assessment Center subscription [sic] had not been cancelled.  Please note that your subscription and the Assessment Center add-on are separate features that require individual cancellation."

42.    For years, Defendant recognized that its cancellation path was long, confusing, and not the "easy" process Defendant promised.  For example, as early as 2015, in internal communications, Defendant acknowledged that the

COMPLAINT

- 17 -

"Cancellation Path is too long," that the "Cancellation process is confusing," and that an ABCmouse membership was "not easy to cancel like advertised." That same year, Defendant's Senior Director of Operations wrote:

> To improve customer experience / satisfaction, . . . I'd take a look at the impact of reducing the number of clicks in the online cancellation flow. I believe there are 8-9 clicks required currently, in order for a customer to successfully end their subscription.

43.     Instead of simplifying the cancellation mechanism, however, Defendant created a customer support response script to respond to complaints from consumers who were billed after believing they had canceled. Thus, for several years, consumers who complained about billing after cancellation would receive an email from Defendant saying, "We show that you attempted to cancel the subscription, but did not successfully complete the process." Defendant did not offer to cancel consumers' memberships, but sent them back to the online cancellation path.

44.     Rather than take steps to make it easier for consumers to cancel their memberships, Defendant often made it more difficult. In April 2016, Defendant added two screens to the cancellation mechanism, which, Defendant found, resulted in a "lower cancellation percentage." In May 2017, after Defendant's Senior Design Director reported that, according to the customer support department, "the cancellation path is too hard to get to and get through," Defendant changed its Parent Dashboard, including to make the "Cancellation Policy" link *less prominent*. Defendant later concluded that as a result of this change, cancellations "decreased by approximately 10%-15%." In June 2017, shortly after this change was made, the same Senior Design Director reported that "the decrease of cancellation % of those entering the Parents Section to completion of the cancellation path."

COMPLAINT

45.     According to Defendant's own data and records, from 2015 to 2018, hundreds of thousands of consumers who visited Defendant's online cancellation path or otherwise contacted Defendant to cancel nevertheless remained subscribed.

46.     It was only after the FTC issued a Civil Investigative Demand to Defendant Age of Learning that the company modified its online cancellation mechanism.  However, despite its modifications, Defendant's cancellation mechanism continued to be located within a link to Defendant's "Cancellation Policy;" continued to contain multiple screens that consumers had to navigate in order to cancel; continued to provide consumers with multiple links that if clicked, would take them out of the cancellation path without warning; and required as many as seven clicks to complete.  Thus, consumers continued to complain that Defendant did not honor their cancellation requests.

47.     Even though Defendant knew of consumer confusion regarding its membership terms and cancellation mechanism, Defendant's stated policy was that it did "not provide full or partial refunds."  Thus, Defendant's restrictive refund policies compounded the consumer injury caused by its misleading memberships and its failure to provide a simple cancellation mechanism.

48.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission because, among other things: Defendant engaged in its unlawful acts and practices repeatedly over a period of at least three years; Defendant continued its unlawful acts or practices despite knowledge of tens of thousands of complaints; Defendant modified its unlawful conduct only after receiving a Civil Investigative Demand from the FTC; and Defendant remains in the business of selling negative-option online educational services and maintain the means, ability, and incentive to resume its unlawful conduct.

1

## VIOLATIONS OF THE FTC ACT

49.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

50.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

51.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### Misrepresentation of Easy Cancellation

52.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its online educational service, Defendant has represented, directly or indirectly, expressly or by implication, that it is easy for consumers to cancel their ABCmouse memberships.

53.    In truth and in fact, in numerous instances in which Defendant has made the representation set forth in Paragraph 52, it has not been easy for consumers to cancel their memberships.

54.    Therefore, the making of the representations as set forth in Paragraph 52 is false and misleading, and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Deceptive Failure to Disclose Automatic Renewal Terms

55.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its online educational service, Defendant has represented, directly or indirectly, expressly or by implication, that it is offering a six- or twelve-month membership to its service.

COMPLAINT

56.     In numerous instances in which Defendant has made the representation set forth in Paragraph 55, Defendant has failed to disclose, or disclose adequately, to consumers that Defendant enrolls consumers who sign up for these memberships in a negative option plan under which Defendant will charge them the price of the membership on a recurring six- or twelve-month term each year until they cancel.

57.     Defendant's failure to disclose, or disclose adequately, the material information described in Paragraph 56 in light of the representation as set forth in Paragraph 55 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Unfairly Charging Consumers Without Authorization

58.     In numerous instances, Defendant has charged consumers without their express informed consent.

59.     Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

60.     Therefore, Defendant's acts or practices as set forth in Paragraph 58 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE
## RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

61.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401–05, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers

COMPLAINT

- 21 -

an opportunity to fairly compete with one another for consumers' business."
Section 2 of ROSCA, 15 U.S.C. § 8401.

62.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller:  (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges.  *See* 15 U.S.C. § 8403.

63.     The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

64.     As described above, Defendant advertises and sell services to consumers through a negative option feature as defined by the TSR.  *See* 16 C.F.R. § 310.2(w).

65.     Under Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Violation of ROSCA

66.     In numerous instances, in connection with the selling of goods or services on the Internet through a negative option feature, Defendant has failed to:

COMPLAINT

- 22 -

a)     clearly and conspicuously disclose all material terms of the negative option feature of the transaction before obtaining the consumer's billing information;

b)     obtain the consumer's express informed consent to the negative option feature before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction; or

c)     provide simple mechanisms for a consumer to stop recurring charges for products to the consumer's credit card, debit card, bank account, or other financial account.

67.     Defendant's practices as set forth in Paragraph 66 are a violation of Section 4 of ROSCA, 15 U.S.C. § 8403, and are therefore a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

68.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

69.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including

COMPLAINT

- 23 -

rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

70.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and ROSCA authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of ROSCA, including the rescission or reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and ROSCA, and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

B.     Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA by Defendant;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act and ROSCA, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

COMPLAINT

1
2
3
4
5     Dated:  September 1, 2020
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

MATTHEW H. WERNZ
JOANNIE T. WEI
Federal Trade Commission
Midwest Region
230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604
(312) 960-5596 [Wernz]
(312) 960-5607 [Wei]
mwernz@ftc.gov
jwei@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

COMPLAINT

- 25 -